*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-BG-0587

IN RE WILLIAM E. WALLACE, RESPONDENT.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 298000)

On Report and Recommendation
of the Board on Professional Responsibility
(DDN-147-15)

(Argued June 3, 2020                    Decided December 11, 2025)

*Eric L. Yaffe*, with whom *Frank J. Sciremammano* was on the brief, for Respondent.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, was on the brief, for the Office of Bar Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and RUIZ and THOMPSON,* *Senior Judges*.

RUIZ, *Senior Judge*: This disciplinary case is before us on exceptions filed by respondent, William E. Wallace, a member of the District of Columbia Bar since 1979, and by Disciplinary Counsel to the Report and Recommendation of the Board

---

* Judge Thompson was an Associate Judge of the court at the time of argument. She began her service as a Senior Judge on February 18, 2022.

on Professional Responsibility ("the Board"). The disciplinary charges alleged that after respondent's representation of twelve clients in a contingent fee financial fraud case was terminated, respondent: (1) failed to timely return client files, (2) refused to answer questions from his former clients about his fee claim, and (3) wrongfully maintained a fee claim against only those clients who had filed disciplinary complaints against him. Disciplinary Counsel charged respondent with violating Rules 1.3(b)(2), 1.16(b), and 8.4(d) of the District of Columbia Rules of Professional Conduct. The Board agreed with the Ad Hoc Hearing Committee that respondent violated Rule 1.16(d) (protection of client interest in connection with termination of representation) but disagreed with the Hearing Committee's determination that respondent violated Rules 1.3(b)(2) (intentional prejudice or damage to a client) and 8.4(d) (interference with administration of justice). The Board also rejected several findings of the Hearing Committee that respondent testified falsely before the Committee. The Board recommended a thirty-day suspension.

Respondent challenges the Board's finding of misconduct and argues that no sanction should be imposed. Disciplinary Counsel argues that the Board erred in concluding that there was no violation of Rules 1.3(b)(2) and 8.4(d) and overstepped its role in setting aside some of the Hearing Committee's factual findings and credibility determinations.

We agree with the Board's conclusion that respondent's actions violated Rule 1.16(d) when he failed to respond to his clients as they considered transitioning to new counsel. We also agree that the record does not support, by clear and convincing evidence, that respondent violated the other charged rules, 1.3(b) and 8.4(d). We disagree with the extent of the Board's determinations with respect to the credibility of respondent's testimony and defer to the fact findings and credibility determinations made by the Hearing Committee with respect to respondent's false testimony at the hearing and reject the Board's revisiting of those findings. Based on these conclusions and taking into account multiple factors in determining the appropriate sanction, we impose a probationary period of ninety days with conditions.[1]

## I. Background

The Board adopted the following findings of the Hearing Committee: In March 2014, respondent, a solo practitioner, agreed to represent twelve victims[2] of an investment fraud perpetrated by an entity known as Charter Investments. Charter

---

[1] Respondent is also a member of the New York and Florida bars. The complainants in this case also filed complaints with the bar disciplinary authorities in New York and Florida; those jurisdictions, however, dismissed the complaints.

[2] One victim was a homeowners' association. Most of the individual victims were retirees, and their investments came from their life savings.

offered certificates of deposit at above-market rates; when the investor clients transferred funds to Charter's account at East West Bank in California, the money was immediately withdrawn and never invested. Respondent agreed to represent the clients on a contingency fee basis. Each of the clients signed a retainer agreement with a fee provision stating that the client "will owe [respondent] no legal fee unless and until [he] secure[s] a recovery" and that the "fee for professional services will be thirty-four percent (34%) of any and all recoveries received by [the client] as compensation for the monies stolen from [the client] by Charter." The provision defined recovery as "the gross amount of any settlement or final judgment recovered on [the client's] behalf, including lump-sum payments, future payments, and periodic payments tied to the settlement of claims."[3] Respondent created a common

---

[3] The full provision stated:

> ***Fees for Services****: My standard billing rate is $950 per hour. However, I have agreed to represent you on a contingent fee basis. I will not bill you by the hour for legal services rendered and you will owe us no legal fee unless and until we secure a recovery for you. Our fee for professional services will be thirty-four percent (34%) of any and all recoveries received by you as compensation for the monies stolen from you by Charter Financial [sic]. "Recoveries," as used in this Agreement, shall mean the gross amount of any settlement or final judgment recovered on your behalf, including lump-sum payments, future payments and periodic payments tied to the settlement of claims. Disbursements and out of pocket expenses not paid prior to recovery will be deducted from*

fund of $10,000 to cover "out-of-pocket" expenses, and the clients contributed to it pro rata.

On various occasions, respondent communicated with his clients both individually and as a group. Respondent's goal was to bring charges against East West Bank because Charter was likely a sham organization. In 2015, respondent contracted with another attorney, Jeannie Yim Figer, to prepare a memorandum (the "Figer memorandum") addressing specific legal questions. Respondent paid $5,000 to Ms. Figer from the clients' expense fund and provided her memorandum to the clients.

Several clients became dissatisfied with respondent's strategy, work, and level of communication. On April 16, 2015, respondent ended his representation of one of the clients, Mr. Ruppel. On April 9, one of the clients informed respondent they had identified attorneys in California, Chris Hagen and Steve Nunez, to represent them in the fraud matter. Respondent emailed the clients the same day, acknowledging the clients' wishes, and sent the Figer memorandum to the clients. In May 2015, five clients terminated respondent as their attorney; eventually, all of

---

*the recovery before distributions being made to you and us.*

the clients terminated their relationship with respondent. He returned the funds remaining in the expense account to the clients.

Respondent contacted Mr. Hagen around April 22, after the clients informed him of their plans, and proposed that he work as co-counsel going forward, but Mr. Hagen rejected the proposal. On May 7, 2015, respondent sent copies of the engagement letters with his former clients to Mr. Hagen and noted his right to a fee even after his representation was terminated.[4] Mr. Hagen then asked respondent to "advise what [his] lien/fee is for each client." Respondent did not respond to this request. On May 12, 2015, Mr. Hagen sent another email to respondent saying he would not honor a lien on the files unless respondent specified a fee for each client. Respondent answered the same day, asking for verification that Mr. Hagen had been retained by the clients. He also stated he had no lien on the file itself, that "[t]he lien is on any monetary recovery that might be secured on the claims arising from or associated with Charter Investment fraud. . . . You have the letters of engagement

---

[4] The engagement letter provided:

> 3 Term of Engagement. Either of us may terminate the engagement at any time for any reason by twenty day written notice to the other, subject, on our part, to applicable rules of professional responsibility and subject on your part to a continuing obligation to honor our right to a recovery of our contingent fee as set forth in paragraph 2.

and can see that Capital Legal [respondent's firm] is entitled to 34% of any recovery." Mr. Hagen understood respondent's answer to mean that he would be asserting a right to a 34% lien on any recovery in addition to any fees due to Mr. Hagen. Mr. Hagen sought further clarification from respondent so he could include it in his own representation agreements with the clients, inquiring if respondent was asserting a "quantum meruit lien whereby [he would] share the 34% fee with subsequent counsel based upon the time spent on the file . . . [or] whether [the clients were] dealing with a 34% fee or a 68% fee." Respondent did not answer Mr. Hagen's further questions. Mr. Hagen sent a reminder email two days later, but respondent again did not respond. Mr. Hagen instructed his clients to seek clarification from respondent on his fee claim. Some of the clients contacted respondent, but received no answer. One of the clients, Ms. Lorenz, emailed respondent to inform him that she had not hired another counsel because of his potential lien; she also noted that she expected him to continue representing her if he was asserting a lien. Respondent did not reply to Ms. Lorenz's email. Mr. Hagen undertook representation of the clients and his agreement with them provided they could be subject to two separate 34% contingency fees (his and respondent's) that would come out of any recovery. Mr. Hagen never received client files or work product from respondent.

Between May 2015 and January 2016, five of the clients—Mr. Ruppel, Mr. Cole, Ms. Lorenz, Mr. Nelson, and the Tamkins—filed disciplinary complaints against respondent with the Office of Disciplinary Counsel that led to the underlying proceeding. In 2016, Mr. Hagen settled with East West Bank, with each of the Charter clients entitled to a monetary recovery. On May 27, 2016, Mr. Hagen contacted respondent to inform him of the settlement and again sought clarification on his fee claim. Respondent answered that he did not intend to assert a fee claim against Mr. Ruppel, the homeowners' association, Mr. Ward, Mr. Woolbright, Mr. Charpentier, Ms. Haynes, or Ms. Freilich.[5] Later, Mr. Hagen informed respondent that he had distributed funds to the clients unaffected by his fee claim and again requested that respondent clarify the amount of fees he would assert against the remaining clients, from whom he had withheld 34% of their share of the settlement recovery. Respondent answered that his claim would be for less than as provided in the engagement letter, but did not specify an amount; instead he advised Mr. Hagen that the clients should propose a reasonable fee, or he would file a claim with the

---

[5] All but Mr. Ruppel had not filed complaints with Disciplinary Counsel. In his testimony before the Hearing Committee, respondent explained that he did not assert a fee claim against Mr. Ruppel because respondent had initiated the termination of their relationship.

Attorney Client Arbitration Board (ACAB).[6]  Respondent also inquired about the amount of fees paid to Mr. Hagen by the clients.

The clients who remained subject to respondent's fee claim—Mr. Cole, Ms. Lorenz, Mr. Nelson, and the Tamkins—then retained George Clark to represent them before the ACAB.  In June 2016, respondent informed Mr. Clark that he would not release his fee claim against these clients in part because of the pending disciplinary complaints against him.  Respondent added that he would not file any claims with the ACAB until the bar complaints were resolved.  Respondent asked Mr. Clark to propose a settlement with proof of fees earned by and paid to Mr. Hagen.  Mr. Clark responded that his clients could not evaluate respondent's fee claim since they were unaware of the work he had performed and asked respondent to make a specific fee demand.  Respondent did not reply.  In September 2016, respondent told Mr. Hagen that he would not claim any right to the settlement funds Mr. Hagen was holding and

---

[6] Arbitration before the ACAB was provided for in the engagement letter:

> 6 Arbitration.  While we do not anticipate any disputes with respect to fees or expenses, and to the extent there are any questions about fees or expenses, we expect they will be resolved by discussions and negotiations.  To the extent necessary, any and all disputes concerning fees and/or expenses (regardless of amount in dispute) will be resolved by way of binding and confidential arbitration before the DC Bar Attorney-Client Fee Arbitration Board consistent with the laws of the District of Columbia and the fee dispute process administered by the DC Bar.

that respondent would raise any potential claim before the ACAB. As a result, Mr. Hagen released the remaining settlement funds, and all the clients were paid. Respondent has not filed any claim with the ACAB but continues to assert his right to do so.

## A. Hearing Committee's Report

The Hearing Committee concluded that respondent violated Rule 1.16(d) by failing: (1) to answer his clients' and successor counsel's questions about his fee claim, and (2) to provide client files to his former clients or Mr. Hagen. It concluded that this conduct also violated Rule 1.3(b)(2) by intentionally prejudicing his clients after termination of the legal representation. The Hearing Committee found that respondent "knowingly expos[ed] [his] clients to financial risk and ultimately delay[ed] their access to settlement funds" while forcing at least four clients to incur the additional expense of retaining counsel for a potential ACAB matter. In the Hearing Committee's view, respondent's misconduct was exacerbated because his contribution to the ultimate recovery was minimal, as there was "no evidence that [he] was entitled to any portion of the recovery," and because it found that respondent gave "untruthful testimony regarding his selective decision to waive his fees for those clients who had not filed a disciplinary complaint against him."

The Hearing Committee reasoned that respondent violated Rule 8.4(d) by selectively maintaining a fee claim against only those clients who had filed disciplinary complaints against him. It found that respondent made "no good faith effort to either inform his clients of the fee he believed he was owed, or to resolve his fee claim through negotiation or the ACAB process." It noted that if respondent truly thought he was owed a fee, then he would have asserted a claim against all clients equally and not just those who had filed complaints against him. Ultimately, it concluded that the record, respondent's demeanor throughout the hearing, and his shifting explanations for treating the complaining clients differently[7] provided sufficient evidence to conclude that he interfered with the administration of justice in violation of Rule 8.4(d).

The Hearing Committee also found that respondent's testimony was "significantly dishonest" on several issues: his reasons for deciding not to waive his fee claim against clients who filed disciplinary complaints; the amount of work he had performed; whether he provided some research to Ms. Figer for her

---

[7] Namely, respondent testified that he maintained a fee claim against the four clients who filed complaints against him only because the disciplinary actions they initiated had "somehow tied his hands." He did not want to change strategy that could be interpreted as in response to their complaints. He also testified that he "did not pursue an ACAB dispute because he did not want to 'spend three weeks putting together a fee petition for the Board.'" The Hearing Committee found that this suggested that respondent "felt free to pursue his fee claims against the remaining Charter clients, notwithstanding the pending disciplinary complaints."

memorandum and whether he received an email sent by a client, Mr. Clark on June 23, 2016, asking respondent to "make a demand" for fees, which he did not answer. The Committee weighed the dishonesty as an aggravating factor in its consideration of an appropriate sanction.

Based on its findings of fact and conclusions of law, the Hearing Committee recommended that respondent receive a sixty-day suspension with thirty days stayed in favor of one year of probation with specified conditions. It also recommended that respondent be required to notify his current and new clients of his sanction.

## B. The Board's Report and Recommendation

The Board rejected several of the Hearing Committee's determinations that were material to the violations the Committee found and its recommended sanction. First, the Board concluded there was insufficient evidence to find that respondent had not returned files to the clients—as respondent testified (without contradiction) that he did so—merely because Mr. Hagen did not receive the files. Second, it concluded that the record did not support by clear and convincing evidence that respondent intentionally lied about: (1) not receiving Mr. Clark's email of June 23, 2016, considering that respondent had readily testified about failing to respond to numerous other emails, (2) his reasons for not waiving his fee claim against the clients who filed complaints during the pendency of the disciplinary proceedings,

noting that "although there is evidence that would support the contention that Respondent's proffered explanation was false, there is not clear and convincing evidence to support that contention" because there were also legitimate reasons for that course of action. The Board also found that the record was insufficiently developed or unclear as to the amount and timing of the work respondent performed for the clients.

Turning to the rule violations, the Board upheld the Hearing Committee's determination that respondent violated Rule 1.16(d) by failing to communicate with and respond to the clients and successor counsel's queries about his fee claim. The Board rejected the Hearing Committee's determination that respondent violated Rules 1.3(b)(2) and 8.4(d). It concluded that Rule 1.3(b)(2) was inapplicable because the rule is coextensive with the attorney-client relationship and ceases to apply once that relationship ends. It reasoned that unlike other rules that explicitly govern an attorney's conduct after a client representation ends, Rule 1.3(b)(2)'s plain language dictates that the rule applies only "*during the course of the professional relationship*." With respect to Rule 8.4(d), the Board concluded that there was insufficient evidence showing that respondent's fee claim against the four clients was improper. Moreover, it reasoned that unlike here, in cases where attorneys have been disciplined for attempting to "silence complainants," the attorneys' attempts were explicit. Finally, the Board found that Disciplinary Counsel had not offered

any evidence showing "the effect or potential effect of Respondent's conduct on the investigation or prosecution of" the disciplinary matter.

Based on the violation of Rule 1.16(d), and considering respondent's false testimony and failure to acknowledge wrongdoing as aggravating factors, the Board recommended a thirty-day suspension, to begin on a day respondent selects and notifies to Disciplinary Counsel in advance. The Board did not comment on the Hearing Committee's proposed period of probation with conditions.

The case comes to us on exceptions to the Board Report and Recommendation filed by both respondent and Disciplinary Counsel.

## II.    Standard of Review

"The scope of our review of the Board's Report and Recommendation is limited." *In re Bailey*, 883 A.2d 106, 115 (D.C. 2005) (quoting *In re Berryman*, 764 A.2d 760, 766 (D.C. 2000)). We must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record"; we must also "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* (quoting *In re Carlson*, 802 A.2d 341, 347 (D.C. 2002)). Judicial review for substantial evidence incorporates Disciplinary Counsel's heightened

evidentiary standard to prove violations by clear and convincing evidence. *In re Mitchell*, 727 A.2d 308, 313 (D.C. 1999) ("It is [Disciplinary] Counsel's burden to establish by clear and convincing evidence that respondent violated the Rules of Professional Conduct."). Although the Board has the power to make its own factual findings, it "must accept the Hearing Committee's evidentiary findings, including credibility findings, *if* they are supported by substantial evidence in the record." *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (alteration in original) (citation omitted). However, like this court, the Board does not owe any deference to "the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and thus are reviewed *de novo*." *Id.* (alteration in original) (quoting *In re Anderson*, 778 A.2d 330, 339 n.5 (D.C. 2001)). An ultimate fact is one that has "a clear 'legal consequence.'" *Id*. (quoting *In re Micheel*, 610 A.2d 231, 235 (D.C. 1992)).

## III.   Discussion

Respondent and Disciplinary Counsel contest several of the Board's conclusions in its Report and Recommendation. We review each in turn.

## A. Violation of Rules of Professional Conduct

### 1. Rule 1.16(d)

Rule 1.16(d) generally addresses a lawyer's obligations to a client upon termination of representation. The Rule states that:

> In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred.

D.C. R. Pro. Conduct 1.16(d). The Board concluded that respondent violated the rule by failing to respond to the clients' and Mr. Hagen's requests for information about his fee claim, which interfered with their ability to evaluate the financial impact of retaining new counsel. *See id.* at cmt. [9] ("Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."). Respondent challenges that conclusion with a two-fold argument. First, he makes a point of interpretation, arguing that he did not violate the rule because he did not contravene any of the specific actions that Rule 1.16(d) states a lawyer needs to take to protect his clients' interest, citing cases where we have found violations grounded on breach of the specific actions listed. Second, addressing the substance of the Board's determination, respondent contends he did

not interfere with the clients' engagement of successor counsel but merely failed "to tell former clients and successor counsel that he was not yet in a position to articulate what his fees should be," which, at most, forms a basis for a Rule 1.4 failure-to-communicate violation, not a Rule 1.16(d) charge.[8]  For its part, Disciplinary Counsel argues that the Board erred in concluding that the evidence did not support that respondent violated Rule 1.16(d) by also failing to return his clients' files to Mr. Hagen.  We disagree with all the foregoing contentions.

As an initial matter, we note there is no language in the rule to suggest, as respondent argues, that the actions set out in the Rule constitute an exhaustive list of what a lawyer must do upon termination of representation.  To the contrary, by using "such as" before listing several enumerated actions, the Rule makes clear they are examples, not a finite list.  *See* 82 C.J.S. *Statutes* § 368 (2025) ("[W]here the word 'include' or any of its variations is more often than not the introductory term for an incomplete list of examples, its use before a list is afforded a presumption of [non-exclusivity] in statutory interpretation.").  The focus of the Rule is on the lawyer's conduct and whether the lawyer acted in a timely manner and as reasonably practicable to protect a client's interest.  That obligation exists regardless of who terminated the representation.  *See* D.C. R. Pro. Conduct 1.16(d), cmt. [9].

---

[8] Respondent was not charged with a Rule 1.4 violation.

Moreover, whether a client was prejudiced "has no bearing on the question of violation." *In re Hager*, 812 A.2d 904, 920 (D.C. 2002) (quoting *In re Landesberg*, 518 A.2d 96, 101 (D.C. 1986)). As applied here, Rule 1.16(d) therefore provides that respondent's failure to communicate about his fee claim to his former clients or successor counsel violated the rule if responding to their queries in a timely manner would have been reasonably practicable and failure to do so would reasonably be expected to interfere with the client's search for new representation, even if no such harm was realized.

On the substance of the violation, the Board agreed with the Hearing Committee's conclusion that "there was clear and convincing evidence to show that Respondent's failure to respond to questions about [his] fee claim . . . was unreasonable and in disregard for his former clients' interests because it affected their ability to evaluate their risk of changing counsel." We concur with respect to respondent's lack of communication with the clients but not with respect to his exchanges with Mr. Hagen.

The evidence shows that once respondent knew the clients were contemplating a change in counsel, he initiated the conversation with Mr. Hagen and offered to act as co-counsel. When his offer was rejected, respondent then sent the engagement letters to Mr. Hagen, pointing out that his firm was "entitled to 34% of

any recovery." Respondent's statement was factual, grounded in the letters of engagement with the clients, *see supra* at note 3. Mr. Hagen, as a lawyer, would be expected to know what the contingency arrangement meant, and how the law might temper it depending on the relative contributions of the lawyers to any eventual recovery. Mr. Hagen insisted on further inquiring whether respondent would claim the full 34% or quantum meruit, saying he wanted to tell the clients whether they would be facing one or two 34% contingency fees. As Mr. Hagen rejected respondent's offer to act as co-counsel and did not suggest any other type of sharing arrangement, respondent reasonably could have understood that Mr. Hagen was in essence opening a negotiation, perhaps hoping respondent would be persuaded to agree, at the outset, to a reduced quantum meruit fee—possibly to make his own agreement more palatable for the clients. Instead, as Mr. Hagen asserted a 34% contingency for himself, the clients ended up entering into an agreement with Mr. Hagen that contemplated they might have to pay two contingent fees of thirty-four percent. *See In re Martin*, 67 A.3d 1032, 1041 (D.C. 2013) ("Generally, an attorney should not acquire 'a greater interest in the outcome of the litigation than his clients.'" (citation omitted)).

It is likely that in this apparent contest of wills between the two lawyers, the clients' interests were not top of mind, as they should be. However, looking only at respondent's communications with Mr. Hagen about his fee claim, we perceive no

Rule 1.6(d) violation. Respondent stated his position three times, within the space of a few days, and sent a copy of the engagement letter that set out the contingency fee arrangement. The Board faulted respondent for not addressing what the nature of his fee claim might be beyond the contingent fee in the engagement letters. Respondent could have been more forthcoming in acknowledging that the contingent fee agreed upon with the clients might have to give way once new counsel entered the picture. But as respondent notes, at the time, before new counsel had performed services or any recovery obtained as a result of such services, it was premature to quantify what a reasonable claim might ultimately be as to each client, or even to ascertain that his fee should be based on quantum meruit rather than a percentage of recovery. Counsel's obligation under Rule 1.16(d) does not require giving ground on a contractual right to successor counsel at such an early stage. We are hard-pressed to say that in the context of language requiring that an attorney act in a "reasonable" and "timely" manner respondent was required to instruct a fellow lawyer on what the law would require as facts unfolded, on pain of violating Rule 1.16(d) if he did not.[9]

---

[9] Disciplinary Counsel's brief discusses respondent's minimal contribution to the eventual settlement and argues that respondent in fact had no claim to any fees. But this argument has the benefit of hindsight; certainly at the time that the clients terminated respondent and were looking for new counsel, the opposite was true since respondent was the only lawyer who had spent *any* amount of time on the matter and thus had some factual basis to assert his contingency fee. *See Kaushiva v. Hutter*,

We come to a different conclusion with respect to respondent's communications (or lack of communication) with the clients concerning his fee claim. Mr. Hagen encouraged the clients to contact respondent directly, and several did so, essentially asking the same question: was respondent claiming a flat thirty-four percent, or a quantum meruit claim? The importance of that difference was brought home by Ms. Lorenz's email to respondent, saying she had not retained other counsel because of respondent's contingent fee, such that she expected respondent would continue to represent her if he stood by the thirty-four percent in the engagement letter. Respondent did not answer her email, nor did he answer any of the other client's requests.

Ms. Lorenz's email reveals that she was well aware of the contingency fee in the engagement letter she signed. What she was asking was whether respondent would forgo that claim in favor of new counsel. The record does not establish whether, at the time of her (and other clients') questions to respondent, respondent knew whether clients had already engaged Mr. Hagen and were being advised by

---

454 A.2d 1373, 1374 (D.C. 1983) (holding that "an attorney who enters into a contingency fee agreement with his client, substantially performs, and is then prevented by his client from completing performance is entitled to the full amount specified in the fee agreement"). In any event, this is not an ACAB fee dispute; whether or not respondent's thirty-four percent contingency fee would ultimately be deemed unreasonable in view of successor counsel's subsequent efforts has scant bearing on whether he violated Rule 1.16(d) at the time his representation ended and the clients were in the process of retaining new counsel.

him regarding respondent's fee claim. But Ms. Lorenz made clear her decision to retain new counsel rested on respondent's answer, which she never received. Ms. Lorenz and the other clients were left to assume respondent would assert his contingent fee as they opted to retain Mr. Hagen, entering into onerous agreements that provided they could face double contingency fee claims totaling 68% of any recovery. Under these circumstances, respondent's complete failure to reply to the clients as the representation was ending with respect to an important matter that would affect the future course of their litigation violated his obligations under Rule 1.16(d).

With regard to Disciplinary Counsel's argument that respondent's alleged failure to return files to his clients also violated Rule 1.16(d), we agree with the Board that the record does not support the charge. We have explained that Rule 1.16(d) "unambiguously requires an attorney to surrender a client's file upon termination of the representation." *In re Hager*, 812 A.2d at 920 (citations omitted). Here, there is evidence that some of the clients specifically requested that respondent forward "relevant documents" to Mr. Hagen. Respondent testified that he returned the files to the clients; Mr. Hagen testified that he did not receive them. None of the clients testified on this issue. The Hearing Committee did not make any factual findings about whether the clients had requested or received their files or the seeming inconsistency between the testimony by respondent and Mr.

Hagen. On this ambiguous record, we agree with the Board that the evidence did not meet the clear and convincing standard of proof necessary to find that respondent neglected to surrender client files.

### 2. Rule 1.3(b)(2)

Disciplinary counsel urges this court to hold, as the Hearing Committee did, that respondent violated Rule 1.3(b)(2) by intentionally harming his clients when he asserted a fee claim to which he was not entitled after they terminated his representation, which delayed distribution of settlement funds to the clients. Respondent counters that the Board correctly concluded that Rule 1.3(b)(2) does not apply to conduct occurring after the legal representation has ended. We agree with the Board's interpretation and its conclusion that respondent did not violate Rule 1.3(b)(2) as a matter of law.

Rule 1.3(b)(2) states that "[a] lawyer shall not intentionally . . . prejudice or damage a client during the course of the professional relationship." D.C. R. Pro. Conduct 1.3(b)(2). Our cases dealing with Rule 1.3(b)(2) involved conduct *during* the attorney-client relationship, not after, *see, e.g.*, *In re Ekekwe-Kauffman*, 210 A.3d 775, 788-89 (D.C. 2019); *In re Dickens*, 174 A.3d 283, 300 (D.C. 2017); *In re Alexander*, 865 A.2d 541, 542 (D.C. 2005); *In re Mance*, 869 A.2d 339, 340 (D.C. 2005), and none explicitly opined on whether Rule 1.3(b)(2) extends beyond the

termination of the attorney-client relationship, to former clients. Disciplinary Counsel concedes that we have not addressed the point directly, but nevertheless directs us to in *In re Mabrey*, in which we found a violation of Rule 1.15(a) (misappropriation of client funds), and impliedly also affirmed a violation of Rule 1.3(b)(2), where the attorney, acting as personal representative for an estate, intentionally misappropriated the estate's funds during and after his representation. 11 A.3d 1292, 1292-93 (D.C. 2011). *Mabrey*, an uncontested case, did not dwell on the Rule 1.3(b)(2) charge, much less consider its application to the post-termination conduct. It sheds no light on the issue before us.

We now address the question of the temporal application of Rule 1.3(b)(2). Our interpretation of the rule begins with its language, which plainly is focused on a lawyer's conduct "during the course of the professional relationship." D.C. R. Pro. Conduct 1.3(b)(2). The term "professional relationship" is not defined in the Rules of Professional Conduct. But by its terms, Rule 1.3(b)(2) is concerned with the professional relationship between a lawyer and a client that is established by the engagement of the lawyer to represent the client. *See id.* Rule 1.3 is directed to that representation by setting out affirmative obligations that guide the lawyer's conduct during the representation: zeal and diligence within the bounds of the law, *id.* at (b)(2)(a), and "reasonable promptness," *id*. at (c); the rule also identifies prohibited actions which are counter to such obligations: actions that intentionally "fail to seek

the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules," *id*. at (b)(1), or intentionally cause "prejudice or damage to a client during the course of the professional relationship." *Id*. at (b)(2). The text of the Rule is thus geared to the aims and scope of the representation. Comment nine to Rule 1.3, as the Board observed, "addresses the attorney-client relationship and the import of having the relationship defined so that a client does not expect an attorney will continue looking after his affairs when the relationship has ceased." Disciplinary Counsel argues that comment nine "refers to Rule 1.3 in its entire[t]y, and not to subsection (b)(2)," and that it supports the proposition that the lawyer's obligation to the client continues after the attorney-client relationship ends. That broad reading finds no purchase in the language of comment nine and fights the stated importance of defining the scope of representation such that any "[d]oubt about whether a client-lawyer relationship still exists should be eliminated by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so." *Id*. at cmt. [9]. That concern makes clear that the professional lawyer-client relationship is coextensive with the scope of engagement of professional services. Once the representation ends, the "professional relationship" and the lawyer's attendant obligations under Rule 1.3 also come to an end.

There are certain continuing obligations to former clients that are set out specifically in the rules: D.C. R. Pro. Conduct 1.6(g) (confidentiality), 1.9 (conflicts of interest), 1.16(d) (duties upon termination). We see no reason to go beyond the plain import of the language of Rule 1.3(b)(2) and extend its obligations to former clients when other rules clearly speak specifically to post-representation obligations. Nor do we see the value in a broad and open-ended interpretation of the term "professional relationship" which lacks parameters for when the relationship ends or fails to provide notice to counsel of the extent of their professional obligations. [10]

Because Rule 1.3(b)(2) applies only to conduct during the attorney-client relationship and the conduct that Disciplinary Counsel relied upon to prove a violation in this case occurred when respondent was no longer representing the clients who had replaced him with other counsel, we affirm the Board's conclusion that as a matter of law, respondent did not violate Rule 1.3(b)(2).

---

[10] For these reasons, we do not find persuasive the cases from other jurisdictions cited by Disciplinary Counsel. *See State ex rel. Counsel for Discipline, Nebraska Supreme Court v. Sipple*, 660 N.W.2d 502, 510 (Neb. 2003) (distinguishing between "professional relationship" and "professional employment" between lawyer and client and referring to post-termination obligation to not intentionally harm client where lawyer threatened client with an unfounded perjury prosecution in an attempt to collect a fee after client had retained new counsel); *In re Gonzalez*, 132 A.D.3d 1, 6 (N.Y. App. Div. 2015) (finding violation of equivalent rule where lawyer was verbally abusive to client's spouse and made false statements to government officials intended to cause client to be deported in response to lawyer being informed that client wished to terminate relationship and obtain new counsel).

### 3. Rule 8.4(d)

Disciplinary counsel argues that respondent violated Rule 8.4(d) when he selectively maintained a fee claim against the clients who had filed disciplinary complaints against him. Respondent urges us to affirm the Board's conclusion that he did not violate Rule 8.4(d) on the ground that Disciplinary Counsel failed to prove the violation by clear and convincing evidence. We agree with the Board's conclusion.

Rule 8.4(d) states that an attorney may not "[e]ngage in conduct that seriously interferes with the administration of justice." D.C. R. Pro. Conduct 8.4(d). We have established three criteria to determine whether an attorney violated Rule 8.4(d): (1) the conduct must be improper because a court rule or a disciplinary rule prohibits such conduct or "simply because, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice"; (2) the conduct "must bear directly upon the judicial process (*i.e.* the 'administration of justice') with respect to an identifiable case or tribunal"; and (3) the conduct "must taint the judicial process in more than a *de minimis* way." *In re Hopkins*, 677 A.2d 55, 60-61 (D.C. 1996) (alterations in original). This court has held that Rule 8.4(d) is "a general rule that is purposely broad to encompass

derelictions of attorney conduct considered reprehensible to the practice of law." *In re Uchendu*, 812 A.2d 933, 940 (D.C. 2002) (quoting *In re Alexander*, 496 A.2d 244, 255 (D.C. 1985)).

We see no reason to disturb the Board's conclusion that respondent did not violate Rule 8.4(d). The question presented under Rule 8.4(d) is whether respondent's decision not to waive his fee claim against the four clients who had disciplinary complaints pending against him (as he had waived for the others) was "improper," and, if so, whether it "seriously interfered" with the administration of justice, in this case, the disciplinary investigation and proceedings. The Board concluded that respondent's conduct was not proved to be improper because respondent provided a plausible non-retaliatory explanation for his decision not to release the complaining clients. It was of the view that respondent gave a "legitimate reason" for acting to maintain the status quo. As the Board explained, waiving his claims against the four clients who filed complaints "may have been construed as a concession that [respondent] had not zealously represented [them] or that he had charged an unreasonable fee." Alternatively, respondent may have sought to avoid the appearance of attempting to influence the clients' disciplinary complaints or interfere with their adjudication. In either case, it was reasonable that respondent may have opted to "proceed with caution" by not attempting to change the status quo while the disciplinary proceedings were ongoing. We need not delve into that

question because we can easily agree that respondent's conduct had at most a de minimis effect on the disciplinary proceedings. Disciplinary Counsel's investigation was not hindered by respondent's actions, and none of the clients linked respondent's fee claim to their ability or willingness to testify. *Cf. Martin*, 67 A.3d at 1055 (holding that a settlement agreement had more than a de minimis effect on the disciplinary proceeding when the client sought "assurance from [respondent] that he would not retaliate for testifying," and the client testified under subpoena). Disciplinary Counsel's brief insinuates that two of the clients did not testify at the hearing due to the assertion of respondent's fee claim but the suggestion is admittedly speculative and insufficient to demonstrate that respondent's conduct could "potentially impact upon the [judicial] process to a serious and adverse degree," as no clients testified to that effect and the record lacks any basis for such insinuation. Two clients did testify even though respondent had not waived his fee claim at the time. Based on the record before us, we conclude that respondent did not violate Rule 8.4(d).

## B. Deference to Hearing Committee

Disciplinary Counsel challenges the Board's rejection of several of the Hearing Committee's findings that respondent provided false testimony, including his testimony about not receiving Mr. Clark's June 23, 2016, email; about his reasons

for not releasing his fee claims against the clients who filed disciplinary complaints; and about the extent of work he performed for the clients.[11] Disciplinary Counsel urges us to clearly establish that the Board is not entitled to reevaluate subsidiary facts on which the Hearing Committee relied to conclude that respondent's testimony was false, especially when the Hearing Committee makes credibility determinations based on the respondent's demeanor. For his part, respondent contests the Board's decision to uphold the Hearing Committee's conclusion that respondent testified falsely regarding the extent of his work on the Figer memo.

As an initial matter, the Board applied the wrong standard of review. In its Report and Recommendation, the Board cites our decision in *In re Bradley*, 70 A.3d 1189 (D.C. 2013), for the proposition that a Hearing Committee's "findings of Respondent's false testimony . . . are reviewed *de novo*." The Board reads *In re Bradley* much too broadly. In that decision, we stated that "the Board and this court owe no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law," and that "[w]hether respondent gave

---

[11] Disciplinary Counsel also objects to the Board's determination that four of the six instances in which the Hearing Committee deemed respondent's testimony to be incredible were not material to the issues presented and insufficiently developed in the record. According to Disciplinary Counsel, these falsehoods were relevant to show respondent's "casual relationship with the truth." We do not address the issue as Disciplinary Counsel acknowledges that the statements "were less material in and of themselves[.]"

*sanctionable* false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." *Bradley*, 70 A.3d at 1194 (first emphasis added) (citation omitted). However, review of the Hearing Committee's evidentiary findings, including credibility findings, remain subject only to a substantial evidence standard. *Id.* at 1193; *see also id.* at 1195 ("[W]e generally defer to credibility determinations made by Hearing Committee members who are in a better position than either the Board or this court to assess the truthfulness of witness testimony."). Our analysis in *Bradley* was in accord with this principle, where we determined that the Hearing Committee's conclusion that respondent's false testimony was "a mere failure to remember" was not supported by substantial evidence. *Id.* at 1194-95. Thus, to summarize, a finding that testimony was false is a credibility determination to which deference is owed if supported by substantial evidence; on the other hand, the determination that testimony was sanctionable because the respondent intentionally gave false testimony is a legal conclusion reviewed de novo.[12] In *Bradley* we addressed both

---

[12] As Disciplinary Counsel's brief puts it:

> De novo review of the credibility of respondents is limited to the ultimate fact of whether false testimony was intentionally false and hence sanctionable. If the committee finds a respondent's testimony to be credible or incredible, the Board must accept that finding unless there is insufficient record evidence to support it. Its de novo review is limited to the question of whether the incredible

types of determinations, concluding that the Hearing Committee's finding that the respondent's false testimony was the innocent product of misremembering was not owed deference because it was not supported by substantial evidence, and, applying de novo review, that the false testimony, being intentional, was sanctionable. *Id.*

With these principles in mind, we consider whether the Board properly reviewed the Hearing Committee's determinations concerning respondent's false testimony. With regard to the Figer memorandum, the Board agreed with the Hearing Committee that respondent intentionally made a false statement when he "testified that he did the research in the Figer memorandum." We disagree, however, that there was substantial evidence to conclude that respondent's testimony was false. Respondent testified that:

> So I wanted to file a lawsuit against Charter Investments. Well, first thing we looked at was can we get prefiling discovery from the bank without filing a lawsuit. And I did that research, and I fed it to Jeannie Figer, which [sic] fed it back to me.

We might have deferred to the Hearing Committee and the Board's finding that this was a false statement if the Figer memorandum addressed only the one discrete issue as to which respondent falsely testified or if the Committee had more narrowly found that respondent's testimony about doing research on the prefiling issue discovery

testimony found by the hearing committee was intentionally false.

was the false statement. But the Figer memorandum covered other issues as well, including whether the bank itself should be sued, and respondent did not claim credit for researching those issues. Moreover, the Board's finding referred to respondent's work on the memorandum as a whole and that is how it understood respondent's testimony, noting the Hearing Committee's comment that "it is hard to believe that Respondent would pay $5000 for a memo based on his own research." Thus, we conclude that the evidence does not substantially support the Hearing Committee's finding that respondent falsely stated that he did the research for the Figer memorandum.[13]

With regard to the June 23 email from Mr. Clark, and respondent's testimony that he did not answer because he did not receive it, the Board noted that the Hearing Committee "did not state whether this testimony was intentionally false or just incorrect." The Board then concluded that respondent's testimony was not intentionally false. The Board noted in particular that it was not "clear from the record why Respondent would intentionally mislead the Hearing Committee about this particular communication" when he had been previously candid about not answering other emails. The Board further noted the disconnect between the

---

[13] In light of our conclusion, we need not address respondent's argument that the Board erred and denied him due process by disallowing his request to supplement the record with further evidence about his work on the Figer memorandum.

Hearing Committee's reliance on the absence of a "bounce back" message which, while relevant, does not automatically lead to the conclusion that respondent therefore must have received and read the email and purposely failed to respond.

Despite the Board's conclusion that respondent's testimony was not *intentionally* false, it is unclear if the Board nevertheless upheld the Hearing Committee's underlying finding that the testimony was actually false (whether intentional or not). To the extent it deferred to the Hearing Committee's factual finding, the Board properly acted within the scope of its review. If it did not, this was error. The Hearing Committee's conclusion was based on substantial evidence, including respondent's "well-documented pattern" of ignoring similar emails from counsel. The fact that the Board found some evidence to the contrary is not determinative of the soundness of the Committee's finding.

With regard, to respondent's testimony about why he did not waive his claim to fees against the clients who filed complaints with Disciplinary Counsel, the Board disagreed with the Hearing Committee, stating that there was not "clear and convincing evidence that this testimony was 'untruthful.'" Although the Board acknowledged that "there is evidence contradicting Respondent's position," it found that there were "legitimate reasons" why respondent did not pursue fee claims

against these clients.[14]  The Board's task was not to determine whether there was clear and convincing evidence that respondent's statement was untruthful, as a factual matter, but whether there was substantial evidence to support the Hearing Committee's conclusion that it was.  And as the Board acknowledged, there was evidence to support the Hearing Committee's determination.  However, to the extent that the Board interpreted the Committee's finding that the testimony was "untruthful" as meaning intentionally false, and for that reason sanctionable, the Board could properly consider the plausible explanations for respondent's actions in making the "clear and convincing" calculus.

Finally, the Board took issue with the Hearing Committee's finding that respondent "falsely inflated the work he claimed to have performed on behalf of his clients."  Specifically, the Board noted that the record was insufficiently developed to "establish the quantity of work completed by Respondent, but there is enough evidence to conclude that he did some work."  The Board also pointed to an exhibit introduced by respondent, listing several "exemplars" of his work with a "Date modified" column. The Hearing Committee had commented that most of those dates were after respondent's representation had ended, but the Board noted there was no

---

[14] As discussed above, these legitimate reasons were also relevant to whether maintaining the fee claims against the complainant clients was improper under Rule 8.4(d), but that is a different question than whether respondent's testimony about his reasons for doing so was inaccurate or intentionally false.

testimony about the meaning of the dates reflected on the exhibit. As we have already observed, however, whether the Board applied the wrong standard by conducting a de novo review and rejecting the Hearing Committee's determination on the ground that there was not "clear and convincing evidence that Respondent was untruthful about the work he did" depends on whether this was a factual determination of the credibility of respondent's statement or an assessment of respondent's intentionally false testimony as sanctionable. The Board owed deference to the Hearing Committee as substantial evidence supported the Hearing Committee's finding that respondent's testimony was not credible; but the Board properly reviewed de novo for clear and convincing evidence if the Committee's determination that respondent "inflated" the amount of work he performed meant that respondent intentionally gave false testimony and could be sanctioned for it. We conclude that the Hearing Committee's analysis and findings were substantially supported by the available evidence and reinstate its original determination that respondent's testimony inflated the amount of work he performed for the clients. We also uphold the Board's legal determination that the record did not support, by clear and convincing evidence, that respondent's testimony in this regard was sanctionable because it was intentional.

As is evident from our analysis, there can be a fine line between a fact finding reviewed for substantial evidence and one that constitutes an ultimate fact subject to

de novo review. Where to draw the line might depend on the words used by the decision-maker and the purpose for which the finding is used. It is important to bear in mind that none of the charged rule violations was based on respondent having presented false testimony[15]; rather the testimony the Hearing Committee deemed false was either discounted in deciding whether the charged rule violations had been proved or taken into account as an aggravating factor in weighing an appropriate sanction. As we now discuss, both the Hearing Committee and the Board weighed respondent's false testimony in imposing a sanction, but in doing so, neither one specified any particular piece of false testimony.

## IV. Sanction

"The discipline we impose should serve not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Tun*, 195 A.3d 65, 74 (D.C. 2018) (internal quotation marks omitted). Although the court gives "a strong presumption in favor of the [Board's]" recommended sanction so long as it falls within a "wide range of acceptable outcomes," the court decides the ultimate

---

[15] If false testimony were the basis for a rule violation, for example, Rule 8.4(d), then it would be an "ultimate fact" and the Board would properly assess, as discussed earlier, whether the evidence clearly and convincingly established that the testimony was "improper" (i.e., intentionally false), and seriously interfered with a judicial proceeding.

sanction to be imposed. *Id.* The Board recommended a thirty-day suspension for the Rule 1.16(d) violation and opted against a stay of the suspension in favor of probation in light of respondent's false testimony and "failure to acknowledge the wrongfulness of his conduct."

We determine the appropriate sanction based on the following factors: "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *Martin*, 67 A.3d at 1052 (citing *In re Elgin*, 918 A.2d 362, 376 (D.C. 2007)). We consider each of these factors in the context of the evidence in this case.

1. *The nature and seriousness of the conduct*. Respondent breached an obligation to his clients by failing to respond to their questions about his fee claim at an important point in their decision-making when his representation was coming to an end and they were considering retaining new counsel. Even if respondent thought his claim was clearly set out in the engagement letters, and he could not then definitively say whether a fee based on quantum meruit would ultimately be appropriate, there is no excuse for his complete failure to respond at all when he

knew a former client depended on his answer to make a decison. This is a serious breach that weighs as an aggravating factor.

2. *Prejudice to the client*. Respondent's lack of communication, which signaled that he was standing on the 34% contingent fee in his engagement letters, led to the clients entering into onerous agreements with Mr. Hagen that theoretically subjected them to the possibility of having to pay two contingent fees that would have consumed most of a recovery. That never came to pass, however, as respondent eventually waived his fee claim altogether as to all but the four clients whose complaints initiated the pending disciplinary complaints. We have determined that was a legitimate course. Although prejudice need not be present to prove a Rule 1.16(d) violation, the absence of actual harm to the clients is relevant on the issue of sanction. This factor weighs in favor of mitigation.

3. *Whether the conduct involved dishonesty*. There has been no finding that respondent's conduct involved dishonesty. This factor weighs in favor of mitigation.

4. *Violation of other disciplinary rules.* There is only one rule violation, Rule 1.16(d); the other charged rule violations have not been sustained by the record. In addition, unlike the Board, we conclude that respondent's exchanges with Mr. Hagen did not violate Rule 1.16(d). This factor weighs in favor of mitigation.

5. *Disciplinary history.* Respondent has had a long career in the practice of law as a member of the District of Columbia bar, with no disciplinary history. This factor weighs in favor of mitigation.

6. *Acknowledgment of wrongdoing.* The Board considered respondent's lack of acknowledgment of wrongdoing as an aggravating factor. The Board agreed that respondent's strategy not to waive the fee claims against the four clients who filed complaints with Disciplinary Counsel was legitimate. Respondent argues vigorously that he was not able to predict what his claim would be at the time he was asked by the clients because it was premature and depended on how the representation unfolded. Even if we conclude that notwithstanding this difficulty respondent's complete failure to answer his clients questions violated Rule 1.16(d), we recognize that "an attorney has a right to defend himself and we expect that most lawyers will do so vigorously, to protect their reputations and license to practice law." *In re Haines*, 341 A.3d 611, 637 (D.C. 2025). This factor also weighs in favor of mitigation.

7. *Mitigating circumstances.* Disciplinary Counsel's case is focused on communications and respondent's failure to respond to clients during a short time span—approximately from May 7 to 26, 2015. Although Disciplinary Counsel appropriately focused on this critical period in the transition from respondent to new counsel for purposes of proving a violation of Rule 1.16(d), that focus is too narrow

for purposes of assessing the proper sanction. Instead, we think it is appropriate to view respondent's failure to communicate with respect to his fee claim in the broader context of other actions he took as his representation of the clients ended: Respondent sent the Figer memorandum to the clients; he refunded the unexpended portion of the clients' contributions to the expense fund upon termination of the representation; when in the midst of their back and forth on the fees Mr. Hagen informed respondent that he would not respect a lien on client files, respondent immediately made clear that he would not assert a lien on client files, only on any recovery pursuant to the engagement letters; respondent testified, without direct contradiction, that he sent client files to the clients; and ultimately, respondent released his fee claims against all clients except the four who had pending complaints against him. As we discussed above, the Board was of the view that was a reasonable course based on legitimate concerns; as to the four unreleased claims, respondent said he would refrain from referring any fee dispute to the ACAB until the disciplinary complaints were resolved. In short, although respondent's failure to respond to questions about his fee claim at a critical point breached his obligations upon the termination of his representation, he also did a number of things right as the relationship was unwound. A contextual view of respondent's actions upon the termination of the representation weighs in favor of mitigation.

Considering the above-listed factors, we think the Board's recommended thirty-day suspension is excessive for the Rule 1.16(d) violation we sustain. As discussed above, we conclude that respondent's conduct vis a vis Mr. Hagen's requests did not rise to a violation of the rule. Disciplinary Counsel has not cited a case in which a 30-day suspension has been imposed for a similar violation of Rule 1.16(d). The cases on which the Board relied involved violations of more than one rule, an extended course of misconduct and/or prejudice to the client. *See, e.g.*, *In re Thai*, 987 A.2d 428, 430 (D.C. 2009) (observing that attorney with multiple rule violations had also "actively obstructed the efforts of his former client and the successor attorney to obtain the file"); *In re Hager*, 812 A.2d 904, 921 (D.C. 2002) (noting respondent's rule violations were numerous and "wide-ranging").

The presentation of false testimony before the Hearing Committee is troubling to the court as it was to the Board and the Hearing Committee.[16] There are two

___

[16] The Hearing Committee found that respondent intentionally falsely testified that he "did the research for the memorandum produced by Ms. Figer." The Committee determined that respondent falsely testified that he: (1) "did not receive the email from Mr. Clark asking him to make a fee demand"; (2) "maintained his fee claims against former clients who had filed complaints against him merely to 'preserve the status quo'"; and (3) "performed an inflated amount of work on behalf of his clients." The Board upheld the Committee's finding that respondent intentionally falsely testified regarding his work on the Figer memorandum but reversed the Committee's other false testimony determinations. On appeal, respondent contests the Board's decision to uphold the Hearing Committee's conclusion that his testimony regarding his work on the Figer memorandum was intentionally false. As explained above, we conclude there was insufficient evidence

instances where the record substantiates that respondent gave false testimony, but not that he did so intentionally. In light of the factors we consider above, and respondent's questionable testimony before the Hearing Committee, we impose a ninety-day period of probation. Probation carries the conditions, recommended by the Hearing Committee and Disciplinary Counsel, that respondent complete six hours of continuing legal education courses in legal ethics and law office management during the probationary period as approved in advance by Disciplinary Counsel and that he inform current and new clients he represents during the term of probation of the fact of his probation.

## V. Conclusion

For the foregoing reasons, we conclude that respondent violated Rule 1.16(d). We also uphold some, but not all, of the Hearing Committee's determinations that respondent gave false testimony. We impose a ninety-day period of probation, to begin within the next twelve months on a day respondent selects and informs in

---

to conclude that respondent's testimony about his work on the Figer memorandum was false, let alone intentionally false. The evidence was also insufficient to support that respondent falsely testified about his reason not to waive his fee claim against only the four clients who filed complaints against him. In sum, we uphold two of the Hearing Committee's four findings that respondent gave false testimony: that he did not receive the email from Mr. Clark and that he inflated the amount of work he performed for the clients. Neither one has been determined to have been intentionally false.

advance to Disciplinary Counsel, during which respondent shall undertake six hours of CLE courses on legal ethics and office management, as approved by Disciplinary Counsel.

*So ordered*.